# IN THE COURT OF APPEALS OF TENNESSEE,
## AT JACKSON

_____

|  |  |  |
|---|---|---|
| **ELPIDIO PETE PLACENCIA**, | ) | Shelby County Circuit Court |
|  | ) | No. 138164 R.D. |
| Plaintiff/Appellant. | ) |  |
|  | ) |  |
| VS. | ) | C.A. No. 02A01-9803-CV-00065 |
|  | ) |  |
| **LAUREN ROCHELLE PLACENCIA**, | ) |  |
|  | ) |  |
| Defendant/Appellee. | ) |  |
|  | ) |  |

**FILED**

**April 13, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

_____

From the Circuit Court of Shelby County at Memphis.
**Honorable George H. Brown, Jr., Judge**

**Edward M. Bearman**,
**Anthony Sammons**,
BRANSON & BEARMAN, PLLC, Memphis, Tennessee
Attorneys for Plaintiff/Appellant.


**Robert A. Talley**,
BROWN, BRASHER & SMITH, Memphis, Tennessee
Attorney for Defendant/Appellee.

OPINION FILED:

**AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART AND REMANDED**


**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**HIGHERS, J.**: (Concurs)


In this child custody dispute, the trial court granted a petition to change custody filed

by Lauren Rochelle Placencia. The court also ordered Elpidio Pete Placencia[1] to pay discretionary costs and attorney fees incurred by Mrs. Placencia. Mr. Placencia appeals the ruling of the trial court. Because we find no material change in circumstances occurring subsequent to the parties' original custody agreement, we reverse the trial court's order granting Mrs. Placencia's petition to change custody. Additionally, because we find that the court did not abuse its discretion in awarding costs to Mrs. Placencia, we affirm the portion of the trial court's ruling regarding this matter. Finally, because we find no statutory authority under which Mrs. Placencia may recover attorney fees, we vacate the trial court's ruling to the extent that it awarded attorney fees to Mrs. Placencia.

### *Factual and Procedural History*

Mr. and Mrs. Placencia were married in December of 1989. Megan, the parties' only child, was born in July of 1990. In February of 1992, when Megan was one and one-half years old, Mr. Placencia filed for divorce, alleging that irreconcilable differences had arisen between the parties. Mr. and Mrs. Placencia subsequently entered into a marital dissolution agreement, which provided that Mr. Placencia would have custody of Megan and that Mrs. Placencia would have reasonable visitation rights. A final divorce decree, which incorporated the parties' marital dissolution agreement, was entered in May of 1992.

In March of 1997, after discovering that Mr. Placencia intended to relocate with Megan to Statesboro, Georgia, Mrs. Placencia filed a petition to change custody. Mrs. Placencia then petitioned for and received a temporary injunction prohibiting Mr. Placencia from removing Megan from the state of Tennessee. Additionally, Mr. Placencia filed a petition seeking permission to relocate with Megan to the state of Georgia. In May of 1997, the trial court entered an order providing that, during the pendency of the petition to change custody and the petition to relocate, custody of Megan should be placed with Mrs. Placencia and that Mr. Placencia should have reasonable and liberal visitation. After hearing the pending motions on December 4 and 5, 1997,

---

[1]Throughout the record, Mr. Placencia's first name is listed as "Elpidio." When giving his deposition testimony, however, Mr. Placencia informed counsel for Mrs. Placencia that the correct spelling of his name is "Elpipio." All of the pleadings, including those filed by Mr. Placencia, state "Elpidio." In order to remain consistent with the record, we have purposefully used this spelling of Mr. Placencia's name in this opinion.

the trial court took the matter under advisement. Thereafter on February 3, 1998, the trial court issued a memorandum opinion holding that there had been a material change in circumstances occurring since the original custody determination and that, considering all relevant factors, it was in Megan's best interests to remove her from the custody of Mr. Placencia and place her in the custody of Mrs. Placencia. Consistent with its memorandum opinion, the court then entered an order granting Mrs. Placencia's petition to change custody. Additionally, the trial court ordered Mr. Placencia to pay $3,936.30 in discretionary costs and $9,063.70 in attorney fees incurred by Mrs. Placencia.

### *Change of Custody*

When considering a petition to modify custody, the threshold issue is whether there has been a material change in circumstances occurring subsequent to the initial custody determination. *See, e.g., Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. App. 1995) (citing *Dailey v. Dailey*, 635 S.W.2d 391, 393 (Tenn. App. 1981)). If the trial court determines that there has, in fact, been a material change in circumstances, the court then seeks to devise a custody arrangement that is in the best interests of the child. *See, e.g., Varley v. Varley*, 934 S.W.2d 659, 665-66 (Tenn. App. 1996)(quoting *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. App. 1993)); Tenn. Code App. § 36-6-106 (Supp. 1998). Absent a material change in circumstances, however, the petition to modify custody must be denied. Our review of the trial court's ruling on a petition to modify custody is *de novo* on the record, accompanied by a presumption of correctness of the findings below. *See Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. App. 1996); T.R.A.P. 13(d). Thus, we may not reverse the ruling of the trial court unless it is contrary to the preponderance of the evidence. *See Hass*, 676 S.W.2d at 555; *Massengale*, 915 S.W.2d at 819; T.R.A.P. 13(d).

In its memorandum opinion, the trial court found "that a change in material circumstances exist[s] which support[s] a conclusion that a change of custody is in the best interests of the minor child." In support of this finding, the court first expressed concern with Mr. Placencia's decision to relocate with Megan to Statesboro, Georgia. In *Taylor v. Taylor*, 849 S.W.2d 319 (Tenn. 1993), the Tennessee Supreme Court expressly held the removal of a child from the jurisdiction was

not, in and of itself, a material change in circumstances sufficient to justify the modification of an original custody order. *See id.* at 332. In *Aaby v. Strange*, 924 S.W.2d 623 (Tenn. 1996), the court further explained that "a custodial parent will be allowed to remove the child from the jurisdiction unless the non-custodial parent can show, by a preponderance of the evidence, that the custodial parent's motives for moving are vindictive—that is, intended to defeat or deter the visitation rights of the non-custodial parent." *Id.* at 629. *See also Tyndall v. Tyndall*, 934 S.W.2d 57, 57 (Tenn. App. 1996).[2] In the case at bar, there is absolutely no evidence that Mr. Placencia's motives for relocating were vindictive.[3] Rather, it appears that Mr. Placencia desired to relocate because he had been offered employment in Statesboro, Georgia with a higher salary. Additionally, it is notable that, prior to his decision to relocate, Mr. Placencia investigated the educational opportunities that were available in Statesboro, Georgia, arranging for Megan to attend a private school in this area. Thus, because the proposed relocation was not the result of vindictive motives, Mr. Placencia's intention to relocate with Megan cannot serve as a material change in circumstances warranting a redetermination of custody.

In support of her petition to change custody, Mrs. Placencia alleged concerns other than Mr. Placencia's removal of Megan from the state of Tennessee. With respect to these allegations, the trial court found as follows:

> First, Ms. Placencia notes that Mr. Placencia has not always adhered to the visitation schedule. On a number of occasions in the past, Mr. Placencia unilaterally changed the visitation schedule, refusing Ms. Placencia's scheduled visitation with her daughter when such visitation conflicted with his personal plans. Second, Ms. Placencia

---

[2]In 1998, the Tennessee General Assembly enacted a new statute relative to parental relocation, which provides in pertinent part as follows:

> The parent spending the greater amount of time with the child shall be permitted to relocate with the child unless the court finds:
>    (1) The relocation does not have a reasonable purpose;
>    (2) The relocation would pose a threat of specific and serious harm to the child which outweighs the threat of harm to the child of a change of custody; or
>    (3) The parent's motive for relocating with the child is vindictive in that it is intended to defeat or deter visitation rights of the non-custodial parent or the parent spending less time with the child.

Tenn. Code Ann. § 36-6-108(d) (Supp. 1998)(effective May 7, 1998).

[3]The trial court expressly found that Mr. Placencia's decision to relocate was not the result of "malevolent motives."

is concerned about certain instances when her daughter has been exposed to inappropriate conduct between Mr. Placencia and his fiancee. When Megan lived with her father, on occasions she was allowed to sleep in the same bed with him and Ms. Koile. Third, Ms. Placencia has cited instances in which Ms. Koile has interfered with her relationship with her daughter by not allowing Megan to speak with her mother on the phone, or cutting phone calls short during a recent extended visit to Georgia. Finally, Ms. Placencia is concerned with Megan's education. Megan was absent from school twenty-eight days in the previous year without any adequate explanation. Further, Mr. Placencia does not provide any religious education for Megan, who attends Sunday School when in the care of her mother.

The trial court then concluded that, even absent Mr. Placencia's decision to relocate, these additional factors were sufficient to justify a change in custody.

On appeal, we must consider whether the aforementioned findings of fact made by the trial court are contrary to the preponderance of the evidence in the record. First, we address the trial court's finding that Mr. Placencia has not been cooperative with respect to Mrs. Placencia's visitation with Megan. Under the parties final decree of divorce, Mrs. Placencia was granted "reasonable visitation rights." The divorce decree, however, did not set forth a specific visitation schedule. Instead, the parties devised a schedule under which Megan would visit with Mrs. Placencia during every other weekend and on every other major holiday. Mrs. Placencia testified that Mr. Placencia was strict or rigid regarding the visitation schedule and that he would get angry when Mrs. Placencia was late bringing Megan home. Mr. Placencia, however, denied that he has been strict regarding visitation, noting times when Megan would visit with Mrs. Placencia during successive weekends. Additionally, Mr. Placencia testified that the parties often arranged for Megan to spend time with both of their families during the major holidays. Mrs. Placencia alleged that Mr. Placencia has occasionally denied her visitation with Megan.[4] Specifically, she referred to an incident that occurred on the fourth of July approximately two years prior to the hearing. Mrs. Placencia had planned to take Megan to a family gathering in Arkansas. At the last moment, Mr. Placencia informed her that she could not visit with Megan. Mr. Placencia admitted that he denied visitation on this occasion but explained that the denial occurred because there was confusion

---

[4]When asked to estimate the number of times that she was denied visitation, Mrs. Placencia stated that she was unable to give a specific number but that it had occurred several times. When recalled to the witness stand, however, Mrs. Placencia estimated that she had been denied visitation on fifteen to twenty occasions.

regarding whose turn it was to visit with Megan. Both parties had planned vacations during the same period of time. According to Mr. Placencia, he informed Mrs. Placencia that if she could reschedule her vacation, she could spend time with Megan when they returned. Additionally, Mrs. Placencia testified that she was denied visitation on the Easter immediately prior to the hearing. Apparently, however, the reason that Mr. Placencia denied visitation on this occasion was that Mrs. Placencia had been allowed to visit with Megan on New Years Eve, which was supposed to be Mr. Placencia's holiday. Other than these two incidents, Mrs. Placencia did not describe in detail any other conflicts regarding visitation. The fact that Mr. Placencia denied visitation on two isolated occasions during a five year period of time does not establish any intent on the part of Mr. Placencia to interfere with the relationship between Mrs. Placencia and Megan. On the contrary, Mr. Placencia testified that he is willing to do "absolutely anything" to ensure that Megan maintains a relationship with her mother, even offering to fly Mrs. Placencia to Georgia twice per year at his expense so that she have extended visitation with Megan. Given their past conflicts regarding visitation, it may be appropriate for the parties to seek an order from the trial court more clearly defining or perhaps enforcing the parties' visitation schedule. Based on the aforementioned testimony, however, we cannot say that Mr. Placencia's denial of visitation on two occasions is sufficient to establish a material change in circumstances.

We next address the trial court's finding that Megan has been exposed to inappropriate conduct between Mr. Placencia and his fiancee. It is undisputed that, during the period of time that he had custody of Megan, Mr. Placencia resided with his fiancee Kimberly Koile. At the time of trial, Mr. Placencia continued to live with Ms. Koile in Statesboro, Georgia. It is also undisputed that, on several occasions, Megan has slept in the same bed with Mr. Placencia and Ms. Koile. Mrs. Placencia testified that she does not have a moral objection to Mr. Placencia living with Ms. Koile but that she does have concerns regarding the fact that Megan occasionally slept in the same bed with the couple. Mr. Placencia testified, however, that Megan was not exposed to anything inappropriate while sleeping with him and Ms. Koile. Additionally, there is no allegation that either Mr. Placencia or Ms. Koile was unclothed or that they engaged in any type of sexual activity while Megan was in their bed. According to Mr. Placencia, Megan sometimes became afraid at night. In order to comfort the child and make her feel safe, Mr. Placencia occasionally allowed Megan to sleep with him. We do not think that this is in any way an abnormal or inappropriate parenting practice.

Thus, the mere fact that Megan has been allowed to sleep in the same bed with Mr. Placencia and Ms. Koile does not constitute a material change in circumstances requiring a redetermination of custody.

We next address the trial court's finding that Mr. Placencia's fiancee has interfered with Mrs. Placencia's relationship with Megan. We have discovered little evidence in the record to support this finding. Mrs. Placencia testified that, on one occasion, she returned Megan after visitation and it seemed as if Ms. Koile was eager to get Megan away from her. Additionally, Mrs. Placencia stated that, on another occasion, Ms. Koile cut short a telephone conversation between Mrs. Placencia and Megan, purportedly because they were planning to leave the house. Finally, Mrs. Placencia expressed a concern that, if Mr. Placencia is permitted to retain custody of Megan, Ms. Koile might interfere with her relationship with Megan. Mrs. Placencia admitted, however, that she is not certain whether this would occur. We do not think that the incidents described by Mrs. Placencia are sufficient to establish that Ms. Koile has attempted to interfere with Mrs. Placencia's relationship with Megan. Given this lack of evidence, we also think that Mrs. Placencia's fear that Ms. Koile might attempt to interfere with this relationship in the future is unfounded. Thus, we find that the aforementioned testimony is insufficient to establish the existence of a material change of circumstances.

Finally, we address the trial court's findings regarding Megan's education. By all accounts, Megan is a very bright child and has always done well in school. Both Mr. and Mrs. Placencia have been involved in Megan's education. Mr. Placencia testified that he attended parent teacher conferences and helped Megan with her homework every night when she was in his custody. Additionally, since Megan was placed in the temporary custody of Mrs. Placencia, Mr. Placencia has called Megan's school to check on her progress. Mrs. Placencia testified that she also monitors Megan's progress, calling her school approximately once every two weeks. It is undisputed that, while in the custody of Mr. Placencia, Megan missed twenty-eight days of school. It appears, however, that Megan was sick on each of these occasions. Gloria Placencia, Megan's paternal grandmother, explained that these days of school were missed because Megan came down with the chicken pox as well as two separate strep infections. Additionally, she noted that Megan has completed all of the assignments that she missed when she was sick. While in the temporary custody

of Mrs. Placencia, Megan was on the honor roll of the private school that she attended. While we have no reason to doubt the quality of this school, we also note that Megan has been accepted by a private school in Statesboro, Georgia that has a graduation and college placement rate of nearly one hundred percent. Thus, regardless of whether Megan is placed in the custody of her mother or her father, we think that she will have an opportunity to receive a quality education. Finally, it is undisputed that Mrs. Placencia takes Megan to church and that Mr. Placencia does not attend church services. There is no evidence in the record, however, suggesting that Mr. Placencia's failure to provided religious education to Megan has resulted in any negative effects on the child. Based on the aforementioned testimony concerning Megan's education, we cannot find any material change in circumstances warranting a redetermination of custody.

For the reasons discussed above, we do not think that Mrs. Placencia has carried her burden of proving that there has been a material change in circumstances sufficient to warrant a change of custody. Thus, we conclude that the trial court's finding of a material change in circumstances is contrary to the preponderance of the evidence. Accordingly, we hold that the trial court erred in granting Mrs. Placencia's petition for a change in custody.

Assuming, however, that there has been a material change of circumstances in the case at bar, we would still find that it is in Megan's best interests to remain in the custody of Mr. Placencia. When determining what is in the best interests of a child, the trial court assesses the comparative fitness of the parties seeking custody. *See Ruyle v. Ruyle*, 928 S.W.2d 439, 442 (Tenn. App. 1996); *Matter of Parsons*, 914 S.W.2d 889, 893 (Tenn. App. 1995). This assessment involves consideration of all relevant factors. *See* Tenn. Code Ann. § 36-6-106 (1996)(listing statutory factors)[5]; *Gaskill*, 936 S.W.2d at 630 (quoting *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. App. 1983))(listing additional factors). In the instant case, both parties agree that Megan is a healthy,

---

[5]This provision was amended in 1998 to add the following as an additional statutory factor:

> Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(10) (Supp. 1998)(effective May 18, 1998).

happy, and well-adjusted child. Mrs. Placencia admits that Mr. Placencia has not been a bad parent to Megan. Additionally, Mr. Placencia concedes that Mrs. Placencia did a good job of parenting while Megan was in her temporary custody. He further speculated that Mrs. Placencia would do a good job of raising Megan if she received permanent custody of the child. Thus, it appears that both of the parties are fit parents. Under Tennessee law, however, there is a strong presumption in favor of continuity of placement. *See Aaby*, 924 S.W.2d at 627, 628; *Gaskill*, 936 S.W.2d at 631; *Taylor*, 849 S.W.2d at 328, 332; *Hill v. Robbins*, 859 S.W.2d 355, 358 (Tenn. App. 1993). Mr. Placencia was granted custody of Megan at the time of the parties' divorce in May of 1992. The child remained in the custody of Mr. Placencia until May of 1997 when the trial court placed Megan in the temporary custody of Mrs. Placencia. Megan apparently thrived during this five year period of time. Thus, we conclude that it is in Megan's best interest to remain in the custody of Mr. Placencia.

### Discretionary Costs

In her motion for discretionary costs, Mrs. Placencia sought reimbursement for the $2,812.50 fee of the guardian ad litem and $1,123.80 in court reporter expenses. The awarding of discretionary costs is governed by Rule 54.04 of the Tennessee Rules of Civil Procedure, which provides in pertinent part as follows:

> Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion. Discretionary costs allowable are: *reasonable and necessary court reporter expenses* for depositions or trials, reasonable and necessary expert witness fees for depositions or trials, *and guardian ad litem fees*; travel expenses are not allowable discretionary costs.

T.R.C.P. 54.04(2)(emphasis added). Thus, Rule 54.04 expressly authorizes the trial court, in its discretion, to award reasonable and necessary court reporter expenses as well as guardian ad litem fees. Trial courts are afforded a great deal of discretion when considering whether to award costs. Absent a clear abuse of discretion, appellate courts generally will not alter a trial court's ruling with respect to costs. *See, e.g., Perdue v. Green Branch Mining Co.*, 837 S.W.2d 56, 60 (Tenn. 1992)(citations omitted). In the instant case, Mr. Placencia does not challenge the reasonableness or necessariness of the court reporter expenses. Additionally, we note that neither party petitioned

for the appointment of the guardian ad litem. Rather, it appears that the guardian ad litem was appointed on the trial court's own motion. There is simply no evidence in the record suggesting that the trial court abused its discretion in awarding costs to Mrs. Placencia. We therefore affirm the trial court's ruling with respect to this matter.

### *Attorney Fees*

In cases involving child custody, the trial court is authorized to award attorney fees under section 36-5-103(c) of the Tennessee Code Annotated, which provides as follows:

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

Tenn. Code Ann. § 36-5-103(c) (1996). Under this provision, the trial court may, in its discretion, award attorney fees to "the spouse or other person to whom the custody of the child, or children, is awarded." Tenn. Code Ann. § 36-5-103(c) (1996). In the instant case, the trial court granted Mrs. Placencia's petition to change custody. Thus, at the time of the hearing on Mrs. Placencia's motion for attorney fees, she was in fact a person to whom custody of the child had been awarded. As explained above, however, the trial court erred in granting Mrs. Placencia's petition to change custody. Consequently, we do not think that she may recover attorney fees under section 36-5-103(c). We therefore vacate the trial court's ruling to the extent that the court awarded Mrs. Placencia $9,063.70 in attorney fees.

### *Conclusion*

For the reasons stated above, we conclude that the trial court erred in granting Mrs. Placencia's petition to change custody. Additionally, however, we conclude that the trial court did

not err in granting Mrs. Placencia's motion for discretionary costs. Finally, we conclude that, because Mrs. Placencia's petition to change custody was granted in error, she may not recover attorney fees. Thus, the ruling of the trial court is affirmed in part, reversed in part, vacated in part, and remanded for further proceedings consistent with this opinion. Costs on appeal are assessed to Mrs. Placencia, for which execution may issue if necessary.

_____
FARMER, J.


_____
CRAWFORD, P.J., W.S. (Concurs)


_____
HIGHERS, J. (Concurs)